Peggy L. THORNE,
Plaintiff-Appellee-Cross-Appellant,

v.

Major "A.B." JONES, et al.,
Defendants-Appellants-Cross
Appellees.

Richard Eugene THORNE,
Plaintiff-Appellee,

v.

Major "A.B." JONES, et al.,
Defendants-Appellants.

Richard James THORNE,
Plaintiff-Appellee,

v.

Ross MAGGIO, et al.,
Defendants-Appellants.

Scott Allen THORNE,
Plaintiff-Appellee,

v.

Ross MAGGIO, et al.,
Defendants-Appellants.

No. 84–3339.

United States Court of Appeals,
Fifth Circuit.

July 22, 1985.

Rehearing and Rehearing En Banc
Denied Aug. 23, 1985.

Joseph Erwin Kopsa, Asst. Atty. Gen., Baton Rouge, La., for Jones, et al.

Stephen E. Everett, Alexandria, La., for Thornes.

Before GEE, TATE, and HIGGIN-BOTHAM, Circuit Judges.

GEE, Circuit Judge:

In these consolidated cases, visitors to and inmates of the Louisiana State Penitentiary at Angola challenge effected and attempted strip searches[1] of their persons.

### Facts

Peggy and Richard E. Thorne are the parents of Richard J. and Scott Thorne. The younger Thornes are inmates at Louisiana State Penitentiary (LSP), a maximum security facility for prisoners who pose severe security risks. Both brothers have been disciplined while in prison for possession of contraband drugs. LSP permits "contact" visits between inmates and approved friends and family.

Mr. and Mrs. Thorne visited their sons at LSP. Before being allowed to do so, each was required to sign a form that stated, among other things, "I hereby agree to a personal search by security personnel of the [LSP] while on prison grounds." A large sign prominently posted just outside the front gate of LSP warned, "Beware Notice If you enter the gates of Angola, you consent to a search of your person and property...."

In November 1981, an LSP inmate told Captain Whistine, an LSP shift commander, that another inmate was receiving contraband in his legal mail and that Scott Thorne was regularly receiving narcotics through the visiting room, probably from his mother. Captain Whistine reported this information to Warden Byargeon. On the Warden's instructions, Captain Whistine ordered a mail watch on the first inmate's legal mail and notified all shifts that Mrs. Thorne was to be asked to submit to a strip search before being allowed to visit Scott Thorne.

Contraband was found in the first inmate's legal mail, lending credence to the informant. When Mrs. Thorne next arrived to visit Scott Thorne, Captain Whistine told her that she would have to be strip searched before seeing him. Mrs. Thorne refused, with some heat, to be searched. Escorted back to the front gates of the prison, she departed. The Warden had her name removed from the list of approved visitors to the prison. Mrs. Thorne was thus unable to visit either of her inmate sons.

Mr. Thorne came to visit Scott Thorne the next day. He, too, was told that a strip search would be required before he could visit his son. Mr. Thorne consented to the search. No contraband was found and the visit took place.

All four Thornes, sensitive to their rights as citizens, obtained counsel and brought actions under 42 U.S.C. § 1983 against the Louisiana Department of Corrections and sundry LSP officials alleging that these doings infringed upon rights secured to them by the Constitution of the United States.[2] Mrs. Thorne and her inmate sons

---

1. In a strip search, the naked body of the subject is very thoroughly inspected, but not touched, by prison personnel of the same sex; the search is conducted in private.

2. Warden Ross Maggio was a named defendant in each of the four actions. Captain Ray Whistine and Major Travis Jones were additional defendants in Mrs. Thorne's action. Mr.

asserted violations of alleged first amendment associational rights; Mr. Thorne alleged violation of his fourth amendment right to be free from unreasonable searches. The actions were consolidated and tried to a jury, which found for all of the Thornes as against some (but not all) of the defendants,[3] awarding damages to each.[4] Defendants (referred to collectively as "LSP") moved for judgment notwithstanding the verdict; the trial court denied their motion. 585 F.Supp. 910. From this denial, defendants appeal. We reverse.

### Rights of Association Guaranteed by the First Amendment?

Mrs. Thorne and her two inmate sons contended that LSP deprived them of rights of association guaranteed by the first amendment. The trial court agreed, holding that Mrs. Thorne had a first amendment associational right to visit her sons in prison and that her sons' right to receive her visits was guaranteed by the same amendment. If this holding be error, as LSP contends, the judgments for Mrs. Thorne and her sons cannot stand, for they neither alleged nor proved deprivation of any other constitutional right;[5] it is axiomatic that no recovery may be had under § 1983 absent proof of deprivation of a right guaranteed by the Constitution or laws of the United States. *See Oklahoma City v. Tuttle,* —— U.S. ——, ——, 105 S.Ct. 2427, 2439, 85 L.Ed.2d 791 (1985) (Brennan, J., concurring).

The trial court cited no authority whatever for the proposition that Mrs. Thorne had an absolute right under the first amendment to visit her sons, and we have found little or none.[6] In *Jones v. North Carolina*

---

Thorne's action was brought against Major Jones, Captain Clovis Tillary, Lieutenant Faren Rachal, and Sergeant Ronald Lemoine. Richard and Scott sued only Warden Maggio and Assistant Warden Herbert Byargeon. Secretary John King and the Louisiana Department of Corrections were also named defendants; however, the trial court granted the former's motion for a directed verdict and the latter's motion to dismiss.

3. The jury found for Warden Maggio in each of the four actions, and for Sergeant Lemoine in Mr. Thorne's action. It returned verdicts against the remaining defendants.

4. Richard and Scott were awarded damages of $5,000 each. Mr. Thorne was awarded damages of $10,000. Mrs. Thorne was originally awarded damages of $15,000. The trial court found this award to be excessive; it granted LSP's motion for a new trial, limited to Mrs. Thorne's damages, when she refused to consent to a remittitur of $10,000. At this second trial, Mrs. Thorne was awarded damages of $5,000. Although Mrs. Thorne made the district court's grant of a new trial on damages the subject of a cross-appeal, we need not, for reasons discussed below, reach this issue.

5. It is important to note that these cases do not involve allegations of deprivation of rights without due process of law; the trial court was not called upon to decide the proper measure of procedural protection to be accorded familial visiting rights and did not do so. Accordingly, that question is not before us.

6. Cases cited by Mrs. Thorne in support of this proposition do not—with one exception—do so.

*Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), involved rights of pretrial detainees, not convicted prisoners; the question of the detainees' constitutional right to contact visits was not before the Court, and it "accordingly, express[ed] no opinion" on it. 441 U.S. at 559 n. 40, 99 S.Ct. at 1885 n. 40. In *Jones v. Diamond,* 636 F.2d 1364, 1377 (5th Cir.1981) (en banc), *cert. dismissed sub nom Ledbetter v. Jones,* 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1982), we stated, "there is no need to consider whether deprivation of visitation would violate constitutional requisites." *Lynott v. Henderson,* 610 F.2d 340 (5th Cir.1980), makes no mention of the first amendment and flatly states, with abundant supporting citation, that "[c]onvicted prisoners have no absolute constitutional right to visitation." *Id.* at 342. The first amendment right at issue in *Rudolph v. Locke,* 594 F.2d 1076 (5th Cir.1979), was freedom of expression, not association, *id.* at 1077. The case did not involve visitation rights. In *Hunter v. Auger,* 672 F.2d 668 (8th Cir.1982), which did, the Court's decision rested on fourth amendment grounds; it did not address first amendment issues. *See id.* at 670 n. 2. The sole authority for the proposition is *McMurry v. Phelps,* 533 F.Supp. 742 (W.D. Louisiana 1982), in which the court stated, without supporting citation, that "basic visitation is a right protected by the First Amendment: freedom of association." *Id.* at 764. *McMurry* is obviously not binding on this Court, and to the extent that it departs from our holding here, we explicitly overrule it.

We note that the Second Circuit has recognized the right of pretrial detainees to contact visits; it has "repeatedly held that *due process*

*Prisoners' Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), the Supreme Court stated:

> The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration.... Perhaps the most obvious of the First Amendment rights that are necessarily curtailed by confinement are those associational rights that the First Amendment protects outside of prison walls. The concept of incarceration itself entails a restriction on the freedom of inmates to associate with those outside the penal institution.

433 U.S. at 125–26, 97 S.Ct. at 2537–38. This language is itself sufficient to refute the notion that incarcerated prisoners retain any absolute rights of physical association; moreover, we have held "that for convicted prisoners '[v]isitation privileges are a matter subject to the discretion of prison officials.'" *Jones v. Diamond,* 636 F.2d at 1376–77, *quoting McCray v. Sullivan,* 509 F.2d 1332, 1334 (5th Cir.), *cert. denied,* 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86 (1975). *See also Block v. Rutherford,* ── U.S. ──, 104 S.Ct. 3227, 3233, 82 L.Ed.2d 438 (1984) ("There are many justifications for denying contact visits entirely"); *White v. Keller,* 438 F.Supp. 110, 114 (D.Md.1977), *aff'd,* 588 F.2d 913 (4th Cir.1978).

Further, it is extremely doubtful that the rights to visitation asserted by the Thornes are the sort of associational rights protected by the First Amendment. *White v. Keller,* a case with strong parallels to these

actions, contains a thoughtful discussion of this issue:

> Freedom of association, as articulated by the Supreme Court, had its genesis in freedom of speech. *NAACP v. Alabama,* 357 U.S. 449, 460 [78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488] (1958). It has always meant the right to associate ideologically: "for the advancement of beliefs and ideas." *Abood v. Detroit Board of Education,* 431 U.S. 209 [97 S.Ct. 1782, 52 L.Ed.2d 261] (1977); *McCrary v. Runyon,* 427 U.S. 160 [96 S.Ct. 2586, 49 L.Ed.2d 415] (1976), *aff'g,* 515 F.2d 1082 (4th Cir.1975); *NAACP v. Alabama,* 357 U.S. at 460 [78 S.Ct. at 1170]. The "right is protected because it promotes and may well be essential to the '[e]ffective advocacy of both public and private points of view, particularly controversial ones' that the First Amendment is designed to foster." *McCrary v. Runyon,* 427 U.S. at 175 [96 S.Ct. at 2597].
>
> As this court sees it the essence of prison visitation is not the ideological association recognized by the courts as protected by the first amendment. Rather, prison visitation raises questions of the right to physical association. The right sought is to see and visit in person with another individual. There may well be a first amendment right to physical association, *see Griswold v. Connecticut,* 381 U.S. 479, 483 [85 S.Ct. 1678, 1681, 14 L.Ed.2d 510] (1965) (right of association includes right to attend a meeting); *see also De Jonge v. Oregon,* 299 U.S. 353 [57 S.Ct. 255, 81 L.Ed. 278] (1937), but if there is, it is because such association is part and parcel of the expression of

forbids denying detainees the right 'to shake hands with a friend, to kiss a wife, or to fondle a child.'" *Marcera v. Chinlund,* 595 F.2d 1231, 1234 (2d Cir.1979), *cert. granted and judgment vacated,* 442 U.S. 915, 99 S.Ct. 2833, 61 L.Ed.2d 281 (1979), *quoting Rhem v. Malcolm,* 371 F.Supp. 594, 626 (S.D.N.Y.), *aff'd and remanded on other grounds,* 507 F.2d 333 (2d Cir.1974), *aff'd after remand,* 527 F.2d 1041 (2d Cir.1975) (emphasis added). It has not, however, extended this right to convicted prisoners. *See Marcera,* 595 F.2d at 1236 n. 7 ("Whatever constitutional right a sentenced offender may have to

contact visitation—and we express no view on the issue—is primarily a matter of the Eighth Amendment's prohibition of cruel and unusual punishment"). Further, the continued validity of these cases after the Supreme Court's vacation of *Marcera* is doubtful; neither *Marcera* nor *Rhem* has apparently been followed since. In any event, this Court expressly rejected *Rhem's* right of visitation for pretrial detainees in *Miller v. Carson,* 563 F.2d 741, 748 n. 9 (5th Cir.1977): "We do not hold that contact visitation is a right for all persons presumed innocent by the law."

ideas. For example, the first amendment expressly protects the freedom of assembly, which is patently a right to associate physically. But this freedom must be read in context; it is not simply a right to associate physically; it is a right to associate physically for the purpose of expressing ideas. *See De Jonge v. Oregon, supra.* And it is not a right merely to be together, [sic] it is a right to *assemble;* it connotes a gathering, not a visitation. While the argument could be made that it includes all physical associations, since no doubt meaningful, protected ideas might be exchanged on any such occasion, the court is doubtful that the rights of association and assembly are so broad. The history, nature and purpose of the first amendment do not warrant this conclusion. Although the amendment protects *all* ideas, its essence is political.

\* \* \* \* \* \*

Thus this court maintains the belief that any first amendment right to mere physical association is so attenuated from the true protections of that amendment as to not be deserving of the usual strictures placed on abridgement of first amendment rights including restriction only by the least drastic means.

438 F.Supp. at 115–16 n. 7 (citations omitted) (emphasis in original); *accord,* L. Tribe, *American Constitutional Law* § 12–23 at 702 (1978) ("What the Court *has* recognized as implicit in the first amendment, and therefore in the liberty secured by the fourteenth, is *a right to join with others to pursue goals independently protected by the first amendment*—such as political advocacy, litigation ..., or religious worship.") (citations and footnotes omitted; emphasis in original).

We agree with the general thrust of Judge Blair's observations in *White:* such freedoms as the Thornes seek to anchor in the first amendment find their true basis elsewhere, perhaps in the ninth, perhaps simply in the character of our polity as a free society. Each of us, as a citizen of the United States—indeed, to a great degree, even as a person merely present here—enjoys the freedom to stroll where he will, to spend his time with those whom he chooses to befriend, to travel without internal passports, and so on. Whatever is not forbidden on our blessed shores is permitted.

It is one thing, however, to trench upon these general freedoms from being hectored and schoolmarmed; only a rational basis is required to support legislative (or, in the instance of prisoners, quasi-legislative) restriction of them. It is quite another to make an inroad on matters specifically protected by the Bill of Rights. For such an invasion, more is required. Courts have written much of the history of modern constitutional adjudication in response to the efforts of persons who sought to transpose the activities which they sought to pursue from the first of these areas to the second. *E.g., Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1972). Some have succeeded; some have not. *White,* discussed above, is such a case; this is another.

■ Such incarcerated persons as the Thorne brothers maintain no right to simple physical association—with their parents or with anyone else—grounded in the first amendment. Indeed, as the quoted matter from *Jones, supra,* indicates, even true first amendment rights are subject to restriction in such circumstances. It is very doubtful, moreover, that even the free citizen enjoys such a first amendment *right* to nonideological association. The freedom to gather to play touch football or to gamble for money stands on a very different footing from a right to hold a political rally or one to assemble to seek redress of grievances. At all events, the claims of the Thorne brothers, whatever their source, to go where they like and to meet with whom they choose have been terminated by a proceeding conducted according to the strictest of due process: a criminal trial.

### Restrictions on Prisoners' Rights

Even were we in the presence of a true, first amendment right, the correct standard for review of a restriction placed upon it, derived from *Bell v. Wolfish,* 441 U.S. 520,

99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and, more recently, *Block v. Rutherford*, — U.S. ——, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984), is whether the restriction in question "is 'reasonably related' to security interests," *Block*, 104 S.Ct. at 3232. If the restriction is reasonably related to legitimate governmental objectives, of which prison security is one, and "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations[,] courts should ordinarily defer to their expert judgment in such matters." 104 S.Ct. at 3232, *quoting Wolfish*, 441 U.S. at 540–41 n. 23, 99 S.Ct. at 1875 n. 23.

In *Block*, pretrial detainees challenged the prison's prohibition of contact visits. The trial court invalidated the prohibition. The Supreme Court reversed:

> [w]hen the District Court found that many factors counseled against contact visits, its inquiry should have ended. The court's further 'balancing' resulted in an impermissible substitution of its view on the proper administration of Central Jail for that of the experienced administrators of that facility.... We hold ... that the Constitution does not require that detainees be allowed contact visits when responsible, experienced administrators have determined, in their sound discretion, that such visits will jeopardize the security of the facility.

104 S.Ct. at 3234.

■ The preeminence of prison security concerns was further emphasized in *Hudson v. Palmer*, — U.S. ——, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The *Hudson* Court held that "prisoners have no legitimate expectation of privacy and that the Fourth Amendment's prohibition on unreasonable searches does not apply in prison cells...." — U.S. at ——, 104 S.Ct. at 3202. The Court's reasoning is relevant here:

The two interests here are the interest of society in the security of its penal institutions and the interest of the prisoner in privacy within his cell. The latter interest, of course, is already limited by the exigencies of the circumstances. A prison "shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room".... We strike the balance in favor of institutional security, which we have noted is "central to all other corrections goals," *Pell v. Procunier*, 417 U.S., [sic] at 823, 94 S.Ct., [sic] at 2804. A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy *always yield to what must be considered the paramount interest in institutional security.*

104 S.Ct. at 3200–01 (citation and footnote omitted) (emphasis added). Taken together, *Hudson*, *Block*, and *Wolfish* indicate unmistakably that security-related decisions of prison officials are to be reviewed only for reasonableness; if the decisions are rational (an exceedingly undemanding standard), courts are to look no further. The trial court here looked further; in so doing, it failed to accord LSP security-related decisions the deference demanded by the Supreme Court.[7]

### Mr. Thorne's Fourth Amendment Claim

As the other Thornes were not searched, they have no fourth amendment claims; as Mr. Thorne's visit does not implicate his freedom to associate in order to express ideas, he possesses no colorable first amendment ones. We turn to his fourth amendment claim.

---

7. *Wolfish*, 441 U.S. at 559 n. 40, 99 S.Ct. at 1885 n. 40, seems to place upon those challenging such decisions the burden of showing the decisions to be irrational or unreasonable. *See Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 132, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629 (1977). This burden could not be met by proof of a less restrictive alternative, *Block*, 104 S.Ct. at 3235 n. 11, for prison officials need not adopt such alternatives. *Id.*

■ As to it, LSP advances several arguments for reversal. In the first of these, LSP seems to argue that the trial court erred in finding the search of Mr. Thorne unreasonable because the finding was grounded on a theory different from LSP's: that a strip search of *any* prison visitor is reasonable as a matter of law, so long as the visitor has prior notice that he is subject to search and is given the option of leaving the prison rather than submitting to the search.[8] LSP's contention thus appears to be that it was error for the trial court to consider the particular circumstances of Mr. Thorne's search. If this is in fact the contention, it is meritless. In *United States v. Lilly,* 576 F.2d 1240 (5th Cir.1978), a case involving body cavity searches of inmates, we stated,

> Although few searches are more intrusive than a body cavity search, we do not hold that such searches are per se unreasonable.... They not only help stem the flow of contraband into, within, and out of prisons, but they also have a beneficial deterrent effect. To prove the legal validity of a *particular* body cavity search, however, the government still must show that the search and seizure *in question was reasonable under all the facts and circumstances.* The relevant facts and circumstances will vary from case to case. In the prison context, however, the government always must show that a legitimate penological need necessitated the search, that the need could not have been satisfied by a more narrow means, and that the search and any consequent seizure were conducted in a reasonable manner. Depending on the facts of a particular case, proof of certain other factors may be necessary to prove reasonableness.

576 F.2d at 1246 (citations omitted) (emphasis added). Although *Lilly* dealt with prison inmates rather than prison visitors, it would be anomalous indeed to accord the former class greater protection from unreasonable searches than the latter. Under *Lilly,* inquiry must be made into the reasonableness of a *particular* inmate search; the reasonableness of particular visitor searches must be determined in the same manner. *See Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982) ("To justify the strip search of a particular visitor under the reasonable suspicion standard, prison officials must point to specific objective facts and rational inferences that they are entitled to draw from those facts...."); *Security and Law Enforcement Employees, District Council 82 v. Carey,* 737 F.2d 187, 205 (2d Cir.1984) (adopting *Hunter* reasonable suspicion standard for strip searches of prison employees); *Giles v. Akerman,* 746 F.2d 614, 617 (9th Cir.1984), *U.S. appeal pending* (adopting reasonable suspicion standard for strip searches of arrestees charged with minor offenses). There being no authority for the proposition that strip searches of prison visitors are *per se* reasonable, LSP's assignment of error must be rejected. It was not error for the trial court to look to the particular facts of Mr. Thorne's search to determine its reasonableness.

■ LSP next argues that the trial court erred in finding Mr. Thorne's search unreasonable under the fourth amendment, either because Mr. Thorne consented to his search or because he waived his fourth amendment rights when he entered the prison. LSP locates this consent or waiver in the visitor form signed by Mr. Thorne and in the warning notices posted at the prison gates. If accepted, this argument would render reasonable a strip search of any such prison visitor; as discussed above, such at-will, random searches are not reasonable under the Fourth Amendment. The argument must therefore fail. *See Carey,* 737 F.2d at 202 n. 23 (rejecting similar "consent" argument). *United States v. Sihler,* 562 F.2d 349 (5th Cir. 1977), the sole authority cited by LSP, does not compel a different result. In *Sihler,* we upheld the search of a prison employ-

---

**8.** A more reasonable rule might condition *contact* visitation on such a search, permitting noncontact visitation upon its refusal. Even so, we express no opinion on its validity as no such rule is before us.

ee's brown paper lunch bag on the ground of consent, both explicitly given by the employee and inferred from a sign at the prison gates warning that all persons entering would be subject to *routine* searches. Strip searches are not "routine;" they cannot be equated with the lunch bag search in *Sihler,* which thus provides no support for LSP's contention. There being no support for the contention, it is clearly meritless. The trial court did not err in rejecting LSP's "consent" defense.

■ Finally, LSP argues that the search of Mr. Thorne was justified by "reasonable suspicion," and that the trial court erred by holding the search unreasonable under this standard. The argument is untenable. " '[R]easonable suspicion' must be specifically directed to the person to be searched.... [T]he fourth amendment does not permit any automatic or casual transference of 'suspicion.' " *United States v. Afanador,* 567 F.2d 1325, 1331 (5th Cir.1978). "To justify the strip search of a particular visitor under the reasonable suspicion standard, prison officials must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience. Inchoate, unspecified suspicions fall short of providing reasonable grounds to suspect that a visitor will attempt to smuggle drugs or other contraband into the prison." *Hunter,* 672 F.2d at 674 (citations omitted). Here, no objective fact pointed to Mr. Thorne as a probable smuggler of drugs into LSP. That an informant pointed to Mrs. Thorne as a likely source of Scott Thorne's contraband does not suffice, under *Afanador,* to justify search of her husband. It is common knowledge that husbands and wives do not concur in all things. LSP offers no other facts on which reasonable suspicion of Mr. Thorne could have been grounded; it is thus clear that the trial court correctly found Mr. Thorne's search to have been without reasonable suspicion, and therefore in violation of the fourth amendment.

*Qualified Immunity*

■ Finally, LSP contends that the trial court erred in rejecting the individual defendants' defenses of qualified, or "good faith," immunity from liability for money damages. Under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982),

officials 'are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' Whether an official may prevail in his qualified immunity defense depends upon the 'objective reasonableness of [his] conduct as measured by reference to clearly established law.' No other 'circumstances' are relevant to the issue of qualified immunity.

*Davis v. Scherer,* —— U.S. ——, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139 (1984) (citations omitted), *quoting Harlow* at 818 (footnote deleted). LSP must prevail on this issue if it was not clearly established in December 1981 that strip searches of prison visitors conducted without "reasonable suspicion" violated the fourth amendment. We conclude that it was not.

First, at that time only one district court had yet ruled on the issue, *Black v. Amico,* 387 F.Supp. 88 (W.D.N.Y.1974) (applying "real suspicion" test to visitor strip search); and in 1979, in *Wolfish,* the Supreme Court had upheld routine strip searches of inmates. Second, in *Carey*—a 1984 decision on 1979–80 events—the Second Circuit affirmed prison officials' qualified immunity from damage liability for unconstitutional strip searches of prison employees on the ground that "[t]hese officials operated in an area in which the law was not charted clearly." 737 F.2d at 211.

We agree. The authorities cited in the foregoing section of our opinion make plain that at the time of the search of Mr. Thorne the law in this area was in a state of uncertainty. Indeed, in our Circuit portions of it become "clearly established" only today.

For the foregoing reasons, we RE-VERSE the judgments favorable to the Thornes and REMAND with instructions to enter judgment for the defendants.