Roger Peter BUEHL and
Deborah Joan Ayres

v.

Joseph D. LEHMAN, Commissioner, Pennsylvania Department of Correction and Donald T. Vaughn, Superintendent, State Correctional Institution–Graterford.

Civ. A. No. 91–CV–4904.

United States District Court, E.D. Pennsylvania.

Sept. 16, 1992.

Michael J. Izzo, Jr., Jennifer Gallagher, Philadelphia, Pa., for plaintiff.

Beth Anne Smith, Philadelphia, Pa., for defendant.

MEMORANDUM

WALDMAN, District Judge.

## BACKGROUND

Defendant Donald T. Vaughn is the Superintendent of the State Correctional Institution at Graterford ("Graterford") and defendant Joseph D. Lehman is the Commissioner of the Pennsylvania Department of Corrections. Plaintiff Roger Peter Buehl is a death-sentenced prisoner at Graterford. He and co-plaintiff Deborah J. Ayres wish to marry. Because Ms. Ayres has been prohibited from visiting Graterford since 1985 when she attempted to smuggle in marijuana, defendants have refused plaintiffs' requests for permission to be married. Plaintiffs assert a variety of constitutional claims, seeking declaratory and injunctive relief and $750,000 in damages. Presently before the court is defendants' Motion for Summary Judgment.

## II. LEGAL STANDARD

■ In considering a motion for summary judgment, the court must consider whether the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact, and whether the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Arnold Pontiac–GMC, Inc. v. General Motors Corporation*, 786 F.2d 564, 568 (3d Cir. 1986); Only facts that may affect the outcome of a case under applicable law are "material." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

All reasonable inferences from the record must be drawn in favor of the non-movant. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. Although the movant has the initial burden of demonstrating an absence of genuine issues of material fact, the non-movant must then establish the existence of each element on which it bears the burden of proof. *J.F. Feeser, Inc. v. Serv–A–Portion*, 909 F.2d 1524, 1531 (3d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)).

## III. FACTS

The pertinent facts of record are uncontroverted and are as follow.[1] Buehl is a death row inmate who was convicted in 1983.[2] He is classified as a maximum management inmate and is housed in a Restricting Housing Unit ("RHU"). *See* Defs.' Exh. 2 (Vaughn Decl.), ¶ 4. Inmates in a RHU are only allowed non-contact visits in the RHU visiting room. *Id.*

On October 22, 1985, Ms. Ayres was visiting Nicholas Yarris, another Graterford death row inmate.[3] During processing, a search revealed that she had three balloons containing marijuana in her pocket which she was transporting for Yarris at his instruction. Defs.' Exh. 2A. Ms. Ayres was arrested for this incident and her visiting privileges were revoked about one week later. Vaughn Aff., ¶ 8. She is the only visitor to Graterford to have attempted to smuggle contraband for a death row inmate in a non-contact visiting room. *Id.*, ¶ 19.

In January 1989, plaintiff Buehl sought permission to include a "D. Jean Ayres Davis," whom he characterized as a "friend," on his list of authorized visitors.[4] Several months later, Ms. Ayres wrote to Superintendent Vaughn and requested reinstatement to visitor status at Graterford and requested placement on Buehl's visitor list. Citing the 1985 incident, Mr. Vaughn

---

**1.** Although the court granted two extensions to plaintiffs' counsel to respond to the instant motion, plaintiffs have not submitted any evidence.

**2.** The facts of the underlying conviction are recounted in *Commonwealth v. Buehl*, 510 Pa. 363, 508 A.2d 1167 (1986), *cert. denied*, 488 U.S. 871, 109 S.Ct. 187, 102 L.Ed.2d 156 (1988).

**3.** At the time, Ayres' surname was Davis.

**4.** It is not clear from the record whether that request was ever acted upon.

denied that request by letter of September 14, 1989. *See* Defs.' Exh. 2C.

On March 18, 1990, plaintiff Buehl submitted a request for a one time special visit by plaintiff Ayres at Easter. *See* Defs.' Exh. 2D. Mr. Buehl's prison counselor denied that request but suggested that Buehl write Superintendent Vaughn and ask for one visit. *Id.*

In October 1990, Mr. Buehl asked Superintendent Vaughn if Ms. Ayres could enter Graterford so that plaintiffs could be married. Vaughn Aff., ¶ 11. Mr. Vaughn denied the request by memorandum of October 16, 1990. *See* Defs.' Exh. 2E. After acknowledging that the purpose of the requested visit was to permit plaintiffs to marry, he stated:

> Based on the seriousness of the incident that caused Ms. Ayres to be barred from this institution, I do not consider her the appropriate kind of individual to be allowed to visit this facility. Your request is therefore denied.

Plaintiff Buehl proceeded to file a grievance with the appropriate Graterford authorities. *See* Defs.' Exh. 2F. He asserted that "I was not involved in Ms. Ayres prior offense, I was not even here at SCI-G [Graterford] when it happened. This incident many years ago is unfairly depriving me of my U.S. constitutional right to get married." *Id.*

The grievance officer reviewed the complaint and filed a report denying Mr. Buehl's request. She stated that Ms. Ayres has been prohibited from entering any SCI in Pennsylvania because she was caught trying to bring drugs into a State facility. *See* Defs.' Exh. 2G. A request by Buehl for an interview was denied by the officer because she could not reverse Superintendent Vaughn's decision. *Id.*

Consistent with prison procedures, plaintiff Buehl appealed this decision to Mr. Vaughn. *See* Defs.' Exh. 2H. Although acknowledging that Vaughn had previously denied the same request, Buehl indicated that the Commissioner had subsequently advised him to pursue the grievance system. Buehl stated:

> I realize that Miss Ayres' visiting privilege was suspended, however, that involved an incident many years ago, and with someone else. Unlike visiting, which is a privilege, marriage is a right under the constitution.
> I'd like you to please reconsider this. If necessary, both Miss Ayres and myself will submit to *any kind* of search you feel is required to assure security is not breached. I've talked with Miss Ayres about this and she said she'd agree to x-ray or *any* internal search—and so will I under the circumstances.

*Id.* (emphasis in original).

Superintendent Vaughn denied the appeal. *See* Defs.' Exh. 2I. He again referred to the 1985 incident and stated that "Miss Aires [sic] actions are of deep concern to the Administration of this Institution and therefore we will not change or amend our decision."

Mr. Buehl appealed this decision to the Central Office Review Committee ("CORC") on December 20, 1990. *See* Defs.' Exh. 3A. He stated:

> I'm not even asking for reinstatement of visits. I'm only requesting permission to marry Miss Ayres. In furtherance of this, I and Miss Ayres have both offered to submit to *ANY* kind of security search deemed necessary to insure your security isn't a problem during the marriage ceremony.
> The restriction on Miss Ayres visiting should not justify a refusal for marriage, particularly where both Miss Ayres and myself would submit to any measure deemed necessary to assure security for the one occasion she would need to enter SCI–Graterford—the marriage ceremony.

*Id.* (emphasis in original)

Commissioner Lehman responded to this appeal on January 30, 1991. *See* Defs.' Exh. 3B. He reported that he concurred with a four member CORC committee which had reviewed the appeal and decided that the denial of Buehl's request was proper. He stated:

> CORC feels that the limitation on your ability to marry Ms. Ayers [sic] is reason-

able and legitimately related to penological interest because of her smuggling concealed drugs into the institution in an attempt to give them to another death row inmate. SCI–Graterford is not saying you can not get married, rather, they are not permitting Ms. Ayers into the institution because she was banned from entering the institution due to a previous serious security breach and illegal act. Knowing the marriage could not be performed without her entering the institution, SCI–Graterford administration must deny your request to marry Ms. Ayers.

*Id.*

Finally, Superintendent Vaughn denied a letter request from Ms. Ayres of July 25, 1991 seeking permission to marry Mr. Buehl. *See* Defs.' Exh. 2J.[5]

## IV. DISCUSSION

### a. The Constitutional Claims

■ "[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987) (citing *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). A prison regulation which impinges upon inmates' constitutional rights must be reasonably related to legitimate penological interests. *Id.* 482 U.S. at 89, 107 S.Ct. at 2261. "This is true even when the constitutional right claimed to have been infringed is fundamental, and the State under other circumstances would have been required to satisfy a more rigorous standard of review." *Washington v. Harper,* 494 U.S. 210, 223, 110 S.Ct. 1028, 1037, 108 L.Ed.2d 178 (1990) (citing *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 2405, 96 L.Ed.2d 282 (1987)). *See also Goodwin v. Turner,* 908 F.2d 1395, 1399 (8th Cir.1990) (reasonable relation test not strict scrutiny applies even

though prison regulation impinges concomitant constitutional right of spouse).[6]

■ Plaintiffs allege constitutional claims under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments. Many of these claims must be summarily rejected. This case presents no issue within the purview of the Fourth Amendment. Since this case involves state action and not conduct of the federal government, the Fifth Amendment is inapplicable. *See Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). An Eighth Amendment claim is presented only where excessive force has been utilized against a prisoner, see *Hudson v. McMillan,* —— U.S. ——, ——, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992), or there has been deliberate indifference to extreme deprivations in the context of confinement. *See Wilson v. Seiter,* —— U.S. ——, ——, 111 S.Ct. 2321, 2326, 115 L.Ed.2d 271 (1991); *Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976). There are no such allegations in the instant case. Plaintiffs also fail to articulate any first amendment claim or to sustain a claim for a denial of procedural due process.[7] It is uncontroverted that plaintiffs were heard on their request to marry on a number of occasions at meaningful times. The Court will thus focus on plaintiffs' remaining Fourteenth Amendment claim.

■ Prisoners have a constitutional right to marry, and thus prison regulations that interfere with that right must be reasonably related to legitimate penological interests. *Turner,* 482 U.S. at 89, 95–6, 107 S.Ct. at 2261, 2265. *See also Zablocki v. Redhail,* 434 U.S. 374, 385–86, 98 S.Ct. 673, 680–81, 54 L.Ed.2d 618 (1978) (marriage is fundamental right and liberty protected by Due Process Clause). The following factors are employed in determining whether a prison policy or regulation satisfies this standard:

---

5. Ms. Ayres stated that the prior incident was a "long time ago," that she had "certainly learned a lesson from it" and that she consented to be searched and to have anyone deemed appropriate act as a security person for her.

6. Plaintiffs erroneously contend that since marriage is a fundamental right, prison regulations which impair that right must be subject to strict scrutiny. Pls.' Br. at 9.

7. In their brief, plaintiffs focus exclusively upon a substantive due process argument.

(1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

(2) whether there are alternative means of exercising the right that remain open to prison inmates;

(3) what impact accommodation of the asserted constitutional right will have on guards, other inmates, and the allocation of prison resources generally; and

(4) whether there are ready alternatives that fully accommodate the prisoner's rights at de minimis costs to valid penological interests.

*Turner*, 482 U.S. at 89–91, 107 S.Ct. at 2261–62.

Unlike *Turner*, the regulation in this case does not effectively proscribe the right to marry as such. It is uncontested that the Commonwealth permits inmates, including those on death row, to marry. Rather, the regulation relied on by defendants permits the authorities to deny prison visitation privileges to persons who have attempted to smuggle in contraband.

It is doubtful that convicted prisoners or those who wish to visit with them, including family and spouses, have a constitutional right to visitation. *See Mayo v. Lane,*

867 F.2d 374, 375–6 (7th Cir.1989); *Thorne v. Jones,* 765 F.2d 1270, 1273–74 (5th Cir. 1985) (no First Amendment associational right to visitation; visitation is privilege subject to discretion of prison authorities); *Smith v. Matthews,* 793 F.Supp. 998 (D.Kan.1992) (no constitutionally protected liberty interest of spouse or inmate husband to prison visitation); *White v. Keller,* 438 F.Supp. 110, 115–18 (D.Md.1977) (neither prisoners nor prospective visitors have constitutional right to prison visitation), *aff'd.,* 588 F.2d 913 (4th Cir.1978); *Feazell v. Augusta County Jail,* 401 F.Supp. 405, 407 (W.D.Va.1975). In any event, the Commonwealth's visitation regulation would survive constitutional scrutiny because it clearly is reasonably related to the legitimate penological interest in maintaining prison security and deterring the introduction of contraband. *See, e.g., Block v. Rutherford,* 468 U.S. 576, 586–89, 104 S.Ct. 3227, 3232–34, 82 L.Ed.2d 438 (1984); *Bell v. Wolfish,* 441 U.S. 520, 558–60, 99 S.Ct. 1861, 1884–85, 60 L.Ed.2d 447 (1979).[8]

Plaintiffs, however, are not suing to obtain reinstatement of general visitation privileges for Ms. Ayres. Rather, they are suing to secure a right to marry.[9] Defendants appear to recognize that it is this right which has been circumscribed. As

---

**8.** The regulation, submitted in its entirety, does not place substantive limits on official discretion of a type sufficient to create a liberty interest. *See* Defs.' Exh. 4; *Kentucky Dep't. of Correction v. Thompson,* 490 U.S. 454, 462–63, 109 S.Ct. 1904, 1909–10, 104 L.Ed.2d 506 (1989).

**9.** Plaintiffs did assert a denial of equal protection. They contend and defendants appear to acknowledge that visitation rights have been restored to other persons caught smuggling drugs to maximum security prisoners. Defendants contend that Ms. Ayres is the only person to attempt to smuggle contraband to a death row inmate in a non-contact visiting room. There may well be a rational reason for distinguishing between visitors who smuggle contraband to maximum security prisoners and death row inmates other than in non-contact visiting rooms on the one hand and death row inmates in different locations on the other. Defendants, however, offer no reasons. Rather, they erroneously rely on cases involving facially neutral regulations which principally impact a suspect class and can be challenged only upon a showing of discriminatory intent to argue that unless defendants treated Ms. Ayres differently because of her membership in a protected class,

there can be no equal protection violation. The state cannot treat similarly situated persons differently without a rational basis. *See Mahone v. Addicks Utility Dist. of Harris County,* 836 F.2d 921, 932 (5th Cir.1988); *Smith v. Coughlin,* 748 F.2d 783, 787–88 (2d Cir.1984) (prison officials must demonstrate rational basis for distinctions in treatment of inmates); *Epstein v. Township of Whitehall,* 693 F.Supp. 309, 314 (E.D.Pa.1988); *Gobla v. Crestwood School District,* 609 F.Supp. 972, 978 (M.D.Pa.1985). *See also Robinson v. Palmer,* 841 F.2d 1151, 1157 (D.C.Cir.1988) (even-handedness in application of visitation suspension policy is legitimate concern for court).

In their brief, however, plaintiffs explicitly state that "it is not requested that Miss Ayres' visiting privileges be reinstated" and "what is being sought is permission for a limited, one time visit" to marry. Pltfs.' at Br. 8, 10. Thus, *in the absence of any allegation or evidence that other inmates seeking to marry persons otherwise denied visitation privileges have been treated differently, summary judgment also will be granted on the equal protection claim.*

noted, on January 30, 1991 defendant Lehman wrote to plaintiff Buehl that the restriction on his right to marry was deemed "reasonable and legitimately related to penological interest" because of Ms. Ayres attempt to smuggle in marijuana in 1985. Yet, in their submissions, defendants maintain only that as Ms. Ayres was validly denied general visitation privileges, then *ipso facto* plaintiff's request to marry her may be denied.

The analysis must begin with the right being circumscribed. Otherwise, a regulation validly circumscribing one right, or even a mere privilege, may be employed to impair other, perhaps more fundamental, rights incidentally affected by that regulation but not contemplated with its adoption and as to which application of the *Turner* factors might result in a very different calculus.[10] For example, a perfectly valid general visitation policy may not necessarily be employed to bar a visit by counsel or legal personnel if this would unduly impair an inmate's Sixth Amendment rights. *See, e.g., Smith*, 748 F.2d at 789.

Accordingly, the court rejects defendants' contention that the fact that the decision to deny Ms. Ayres general visitation privileges incidentally impairs plaintiffs' right to marry "is beside the point." Defs.' Br. at 10. The only case defendants cite in this regard is *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754 (3d Cir. 1979). That case involved a policy of limiting inmates generally to non-contact visits and did not involve an asserted denial of the right to marry. In upholding the policy against a deprivation of liberty and violation of privacy right claim,[11] the Court expressly found that institutional security warranted a denial of the very right plaintiffs sought to exercise.

Thus, the issue is what must prison authorities do, consistent with *Turner*, to accommodate the exercise of a fundamental right. The impact and security implica-

tions of general recurring visitation by one deemed to be a security risk may be quite different when assessed in the context of a single brief visit at a time of the warden's choosing by one who has agreed to "any kind of search you feel is required" for the purpose of being married.

There are alternative means of communication to visitation. *See Robinson*, 841 F.2d at 1156. There appear to be no alternative means of meaningfully exercising the right to marry open to plaintiffs if Ms. Ayres is denied brief physical access to the institution except the presumably less palatable one of escorting Mr. Buehl to a site outside the institution.

The impact on guards and prison resources would appear to be more substantial in the case of routine visits during and throughout normal busy visiting hours than in the case of a single brief visit at a time and location of the warden's choosing. A marriage ceremony can be performed in several minutes.

There may be undue institutional problems and security risks inherent even in such a brief one-time visit. Defendants, however, have not identified any. They have presented sound reasons for denying general visitation privileges to Ms. Ayres. They have not undertaken a *Turner* analysis of the policy of precluding one-time limited physical access to exercise the right to marry to one otherwise denied general visiting privileges, or presented evidence pertinent thereto.

Accordingly, summary judgment cannot be entered for defendants on plaintiffs' claim for injunctive and declaratory relief. Prior to further proceedings, defendants may want to assess the appropriateness of applying criteria valid for restricting general visitation privileges to circumscribe the constitutional right to marry, and their ability to accommodate the exercise of that right without assuming undue institutional

---

**10.** Indeed, the Department has an inmate marriage regulation which specifically refers to security risks only with regard to the site of the ceremony and to the visitation regulation only with regard to persons seeking to enter the institution to solemnize the marriage. *See* Defs.' Exh. 5.

**11.** Plaintiffs in *Pierce* were pretrial detainees and not convicted prisoners.

burdens or jeopardizing valid penological interests.

### b. Claim for Damages/Qualified Immunity

Plaintiffs also seek damages of $750,000 from defendants who are sued in their official and individual capacities.

■ Absent consent, the Eleventh Amendment precludes an award of damages in a § 1983 suit against a state brought by one of its citizens. *See Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 98–99, 104 S.Ct. 900, 906–07, 79 L.Ed.2d 67 (1989). Pennsylvania has not consented to be sued in federal court. *Id.* at 103 n. 12, 104 S.Ct. at 909 n. 12. Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *See Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). "As such it is no different from a Suit against the State itself." *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2311, 105 L.Ed.2d 45 (1989). Accordingly, judgment will be entered for defendants on plaintiffs' damage claims against defendants in their official capacity.

■ Defendants have asserted qualified immunity from damages in their individual capacities. Officials exercising discretionary powers are immune from liability for civil damages for conduct which does not violate a clearly established constitutional right of which a reasonable person would have been aware. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The appropriate analysis must begin with a determination of whether a plaintiff has set forth a claim for violation of a clearly established constitutional right. *Siegert v. Gilley,* —— U.S. ——, ——, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). In *Siegert,* the Court logically counselled that the initial step in this process is a determination of whether a plaintiff has set forth a claim for violation of any constitutional right at all. *Id.* Of course, it would also logically follow that if a plaintiff fails to allege a constitutional violation or to adduce sufficient evidence to demonstrate such a violation, a defendant could prevail on a Rule 12(b)(6) or Rule 56 motion respectively, quite apart from any claim of qualified immunity.

In the instant case, a fair reading of the complaint suggests that defendants are depriving plaintiffs of their right to marry when the exercise of that right could be easily accommodated with minimal institutional or penological impact. Defendants have made no showing to the contrary. They merely maintain that because there are valid reasons for denying plaintiff Ayres general visitation privileges, they may impair plaintiffs' right to marry. Plaintiffs have set forth a cognizable claim for deprivation of a constitutional right on which, based on the record now before the court, they could as a matter of law prevail.

The court must next determine whether, in the circumstances of record and in light of clearly established legal principles, the defendant officials reasonably could have believed that their actions denying plaintiffs' request to marry were lawful. *See Anderson v. Creighton,* 483 U.S. 635, 640–41, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). The court concludes that they could have done so.

Defendants reasonably could have misperceived that a regulation validly circumscribing a particular right or privilege could be employed generally without the need to undertake an independent *Turner* assessment regarding the exercise of another right, that of marriage, collaterally impaired by such action. Defendants reasonably could have believed that if Ms. Ayres validly could be denied institutional access for any purpose, then she could be denied access for all purposes.

Accordingly, defendants will be afforded qualified personal immunity from damages in this case.

## V. CONCLUSION

Plaintiffs have set forth a cognizable § 1983 claim for violation of their constitu-

tional right to marry. On the record adduced, defendants have not shown that the exercise of that right cannot be easily accommodated consistent with legitimate institutional concerns and penological interests, in accordance with a *Turner* analysis and the balancing of factors inherent therein. Defendants have not shown that they are entitled to judgment in their favor as a matter of law.

Plaintiffs may not recover damages on their claims against defendants in their official capacities. Defendants are entitled to qualified immunity in their individual capacities. The case will proceed on plaintiffs' equitable claims.