**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-2193**

ANGELA CALLOWAY,

        Plaintiff - Appellant,

    v.

BENJAMIN J. LOKEY, in his individual capacity; JEFFREY L. BROWN, in his individual capacity; EDWARD O. HOSKIE, in his individual capacity; HEIDI M. BROWN, in her individual capacity; HEATHER K. HALE, in her individual capacity; JEREMY J. NELSON, in his individual capacity,

        Defendants - Appellees,

    and

COMMONWEALTH OF VIRGINIA; JOHN A. WOODSON, Warden, Augusta County Corrections Center; RANDOLPH HOSKIE, in his official and individual capacity; NICHOLAS S. SHIRES, in his individual capacity; JANE DOES 1-2 (TWO UNDIENTIFIED FEMALE CORRECTIONS OFFICERS), in their official and individual capacities,

        Defendants.

Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg.  Elizabeth Kay Dillon, District Judge.  (5:16-cv-00081-EKD-JCH)

Argued:  October 30, 2019                     Decided:  January 21, 2020

Before NIEMEYER, KING, and WYNN, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the majority opinion, in which Judge King joined. Judge Wynn wrote a dissenting opinion.

---

**ARGUED:** Christopher M. Okay, CHRIS OKAY, ATTORNEY AT LAW, Staunton, Virginia, for Appellant. Michelle Shane Kallen, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees. **ON BRIEF:** Mark R. Herring, Attorney General, Victoria N. Pearson, Deputy Attorney General, Richard Carson Vorhis, Senior Assistant Attorney General, Toby J. Heytens, Solicitor General, Matthew R. McGuire, Principal Deputy Solicitor General, Brittany M. Jones, John Marshall Fellow, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.

---

NIEMEYER, Circuit Judge:

In this appeal, we are presented with the question of whether corrections officers had a reasonable suspicion sufficient under the Fourth Amendment to justify conducting a strip search of a prison visitor who was visiting an inmate.

Prison visitor Angela Calloway commenced this action under 42 U.S.C. § 1983, alleging that corrections officers at the Augusta Correctional Center in Craigsville, Virginia, violated her rights under the Fourth Amendment by subjecting her to a strip search during her visit with inmate Travis Talbert. At the time of her visit, some of the officers knew that Talbert had been transferred to Augusta earlier in the year after attempting to smuggle contraband into a different Virginia prison. Moreover, two days before Calloway's visit, one officer received a tip from an inmate that Talbert was "moving," a prison term for smuggling drugs. Based on this information, Augusta corrections officers decided to keep a close watch on Talbert during that weekend's visitation session. When Calloway visited Talbert that weekend, the officer designated to monitor the visit on a video feed observed what he believed to be Calloway unbuttoning her pants while in the visitation room. At this point, two supervising officers decided to interrupt the visit and request that Calloway agree to a strip search. She signed a consent form, and two female officers conducted the search but did not find any contraband. Calloway was then permitted to resume her visit with Talbert.

On the corrections officers' motion, the district court entered summary judgment in their favor, concluding that the officers had a reasonable suspicion that Calloway was

3

attempting to pass contraband to Talbert and therefore that the strip search of Calloway was lawful. For the reasons that follow, we affirm.

I

In February 2016, while incarcerated at the Bland Correctional Center, in Bland, Virginia, Travis Talbert and another inmate were caught attempting to smuggle several pounds of tobacco into the prison. The plan was for Talbert's mother and the other inmate's sister to leave the tobacco at a predetermined spot on the prison's property for a third inmate to later retrieve, but the women were discovered and arrested shortly after hiding the tobacco. Talbert was sentenced to 30 days of disciplinary segregation after admitting his involvement in the offense, and he was thereafter transferred to the Augusta Correctional Center, a more secure facility. Shortly after his transfer, Augusta's Institutional Investigator, Sergeant Benjamin Lokey, learned of Talbert's disciplinary conviction at Bland and the reason for it.

Thereafter, Sgt. Lokey "started to hear the name 'Travis' going around with the informants" in the prison, with a few inmates suggesting generally that Lokey should keep an eye on an inmate named "Travis." Having only the name "Travis," Lokey was not sure that the tip referred to Talbert, but Talbert's "history made [Lokey] suspicious." Then, on Friday, July 15, 2016, Lokey "heard while walking through the prison that Talbert was moving," a term that Lokey knew to be prison slang for smuggling drugs. Based on this tip and his knowledge of Talbert's prior smuggling attempt, Lokey became concerned that Talbert would attempt to smuggle drugs into Augusta. Accordingly, as Lokey was leaving

4

work that day, he asked Master Control Officer Jeremy Nelson — who was scheduled to monitor the security cameras posted in the visitation room during that weekend's visitation session — to pay particular attention to Talbert and any visitor he might receive.

As an officer assigned to the "master control" room, Officer Nelson had experience "monitor[ing] streaming video of the offenders and their visitors" to "watch for activity that might be suspicious, such as excessive nervousness, movements between offenders and visitors, dropping motions, and adjustments of clothing." Indeed, there had been at least two instances when Officer Nelson's observations had led to the interception of contraband in the visitation room, and Sgt. Lokey regarded Nelson's record of identifying suspicious activity as "very successful."

Around noon on July 17, 2016 — *i.e.*, just two days after Sgt. Lokey had heard that Talbert was "moving" — Angela Calloway arrived at Augusta to visit Talbert. This was her second visit to Augusta to see Talbert, the first having taken place the month before. Calloway, a nursing assistant in her mid-thirties, had received permission to be one of Talbert's authorized visitors after the Virginia Department of Corrections had conducted a check of her criminal record. As she entered the facility on July 17, Calloway passed through the standard security screening procedures used for all visitors, which included removing her shoes, walking through a metal detector, and being "patted down." Calloway's pat down was conducted by Sergeant Heidi Brown. Sgt. Brown later recalled that Calloway "looked a little frazzled and kind of nervous," but explained that nervous behavior "is normal when anybody comes for the first time because they're coming into a prison." Nevertheless, when Sgt. Brown notified Officer Nelson that Talbert had a visitor

5

entering the facility, she specifically mentioned that the visitor "was acting nervous." Nelson met Calloway in the lobby of the administration building and checked her visitor's pass before letting her into the visitation room; he too thought that "Calloway appeared to be nervous."

Calloway was assigned to a table at the far end of the busy visitation room where she was soon joined by Talbert. During the course of their hour and a half visit, Officer Nelson closely monitored Talbert and Calloway from his position in the master control room by watching live video footage from two security cameras that he focused on their table. Although the security cameras did not record the live video feed, a "choppy video" comprised of a series of still images taken at approximately five frames per second is part of the record.

According to Officer Nelson, Calloway "continued to seem nervous" during her visit with Talbert. More specifically, he noticed her "fidget[ing] with her waistband on several occasions" and "adjust[ing] her clothing several times" in a manner that could be consistent with "moving contraband from underneath her clothing to a position where it could be easier retrieved." Nelson also thought that "Talbert seemed to be keeping an eye on the correctional officers as they made their rounds" through the visitation room. Then, about an hour into the visit, Nelson observed Calloway adjust her clothing in a manner that "looked [to Nelson] like she [had] reached inside the front of her pants." Based on that observation from the live video feed, Nelson believed that Calloway had just unbuttoned her pants, and he immediately contacted Sgt. Lokey to report what he had seen.

6

Based on Officer Nelson's report, Sgt. Lokey contacted Unit Manager Jeffrey Brown, the highest-ranking officer on site at the time. Lokey and Brown discussed the situation and agreed that the visit between Talbert and Calloway should be interrupted and that Talbert should be taken from the visitation room for a strip search. They also agreed to speak to Calloway to request that she consent to such a search.

Accordingly, shortly before 2:00 p.m., four corrections officers approached the table at which Talbert and Calloway were sitting. Two of them took Talbert out of the visitation room, while Sgt. Lokey and Unit Manager Brown escorted Calloway to an office off of the main hallway. According to Calloway's sworn statement and deposition testimony, Lokey "started accusing [her] of unbuttoning [her] pants" and stated that the officers had recorded her doing so on camera. Lokey further told her that the prison had a "problem with people trying to bring drugs into the [facility]" and that, as a result, the corrections staff had to be "very cautious." Calloway denied trying to unbutton her pants; denied possessing any contraband; and stated that she "would never do something like that ever." She also asked to see their video evidence. At that point, according to Calloway, Lokey stated that they "would need [for her] to consent to a strip search." When she protested that she did not understand and had done nothing wrong, Lokey repeated, "'Well, we are going to need you to consent to the strip search because we have reason to believe that you brought contraband here, and we do have you on camera trying to unbutton your pants.'" Lokey also indicated that if Calloway did not consent to a strip search, she would not be permitted to come back to the prison, whereas if she did consent to the search and was found not to have any contraband, she would be permitted to come back for the next visitation session.

7

Sgt. Lokey then handed Calloway a consent form authorizing the strip search and told her "to look over it very carefully." By Calloway's account, she was "bawling crying and didn't understand what was going on" but "looked over the form the best [she] could" before signing it. She later testified that she was scared and in shock and thought that if she did not sign the form, she would not be permitted to leave.

After signing the form, Calloway was escorted to a private office by two female officers, Sgt. Heidi Brown and Officer Heather Hale, who were told that Calloway had signed the strip-search consent form. When they reached the private office, Calloway informed the officers that she was menstruating, and so the three women relocated to a women's restroom. Because the door to that restroom did not lock, Brown told Hale to stand at the door to ensure that no one entered. Brown explained the search procedure to Calloway and then had her remove her clothing one piece at a time, with each item being searched before another was removed. When Calloway had taken off all her clothes, she complied with Brown's directions to lift her arms and breasts, open her mouth, and lean over and shake her hair. According to Calloway, Brown also put her hands through her hair to check it for hidden contraband. At Brown's direction, Calloway next went into the bathroom stall and removed her tampon, which Brown inspected before disposing of it. Calloway then twice performed the "squat and cough" maneuver, and, according to Calloway, she also spread her buttocks for the officers' inspection. When the search revealed no contraband, Calloway's clothing was returned. She was also offered another tampon but stated that she did not need one.

After she dressed, Calloway was taken back to the room where Sgt. Lokey and Unit Manager Brown were waiting. According to Calloway, Lokey stated that he was sorry that they had had to conduct the strip search but that they would allow her to resume her visit with Talbert since she had been so cooperative. Unit Manager Brown then escorted her back to the visitation room where she rejoined Talbert, but she remained "upset by what [had] just happened."

Around this time, Lieutenant N.S. Shires — one of the officers who had searched Talbert and found that he also did not have any contraband on his person — "observed that [Calloway] was upset and attempted to calm her down." By Calloway's account, another corrections officer, Lieutenant Edward Hoskie, also approached her to "apologize for what [had] happened," and he "tried to explain" that sometimes "people think they see something but they didn't really see something, but they make their own assumption of it" and that this was "what happened here." Calloway was permitted to remain in the visitation room with Talbert for an extra 30 minutes after the visitation period ended, and then Hoskie escorted her to the prison's front door.

Calloway commenced this action in December 2016, naming seven corrections officers, in their individual capacity, as defendants — Unit Manager Jeffrey Brown, Lt. Hoskie, Sgt. Lokey, Lt. Shires, Sgt. Heidi Brown, Officer Hale, and Officer Nelson. Calloway later agreed to dismiss her claims against Lt. Shires. In her complaint, Calloway sought damages under 42 U.S.C. § 1983, alleging that the officers had violated her Fourth and Fifth Amendment rights. She also asserted state law claims for assault, false imprisonment, and intentional infliction of emotional distress.

9

Upon the completion of discovery, the district court granted the corrections officers' motion for summary judgment. *See Calloway v. Brown*, No. 5:16-cv-81, 2018 WL 4323951 (W.D. Va. Sept. 10, 2018). First, it granted Lt. Hoskie's motion because "he lacked any actionable personal involvement in the events." *Id*. at *6. Next, it dismissed Calloway's claim based on the Fifth Amendment, noting that "'if a constitutional claim is covered by a specific constitutional provision, such as the Fourth . . . Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.'" *Id*. at *7 (quoting *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)).

On Calloway's Fourth Amendment claim, the court held that the undisputed facts established as a matter of law "that the search was justified because it was supported by reasonable suspicion" and that therefore, "regardless of the voluntariness of Calloway's consent, [the] defendants [could not] be held liable for their respective roles in conducting that search." *Calloway*, 2018 WL 4323951, at *1. In reaching this conclusion, the court observed that it had reviewed the video of Talbert and Calloway's visitation session in its entirety and that, while "[m]ost of the video reflects largely innocuous behavior," it did capture "several times where Calloway's hands were in and near the waistband of her pants" and two instances in particular where "it [was] hard to tell whether she [was] unbuttoning her pants or merely adjusting her pants where a button would be." *Id*. at *4. The court concluded that "there [was] nothing in the record that supports any assertion that [Officer] Nelson made up the conduct that he reported to [Sgt.] Lokey." *Id*. And it also concluded that Lokey and Unit Manager Brown "were entitled to rely" on Nelson's report,

10

*id.* at *9, particularly given that his "past observations of suspicious behavior in the visitation room had led to the seizure of contraband," *id*. at *10. Alternatively, the court held that "all defendants [were] entitled to qualified immunity."

Finally, the court retained supplemental jurisdiction over Calloway's related state law claims and concluded that the corrections officers were entitled to summary judgment on those claims as well.

From the district court's judgment dated September 10, 2018, Calloway filed this appeal.[1]

II

Calloway contends that the district court erred in granting the corrections officers summary judgment on her Fourth Amendment claim, maintaining that the court improperly resolved disputed facts, particularly with respect to what the video of her visit with Talbert showed. She argues that the court "viewed the video evidence in the light most favorable to the moving Party Defendants, amounting to an end-run around Rule 56." (Emphasis omitted). Calloway claims that Officer Nelson "misidentified the instances of 'suspicious conduct,' or he made up the references out of whole cloth." In Calloway's view, this infected the entire justification for the strip search, precluding summary judgment on the issue of whether the corrections officers "had [a] reasonable suspicion for the warrantless search."

---

[1] On appeal, we do not understand Calloway to be challenging the district court's rulings dismissing her claims against Lt. Hoskie and her claim under the Fifth Amendment.

11

Of course, if a dispute of fact is genuine and the fact is material, summary judgment is not available. *See* Fed. R. Civ. P. 56(a) (requiring that there be "no genuine dispute as to any material fact" and that the moving party be "entitled to judgment as a matter of law"). We review a summary judgment de novo, applying the same standard that the district court was required to apply. *See W.C. English v. Rummel, Klepper & Kahl, LLP*, 934 F.3d 398, 402–03 (4th Cir. 2019).

The parties do not dispute the applicable legal principles for conducting a lawful strip search in the prison context. The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against *unreasonable* searches," U.S. Const. amend. IV (emphasis added), and it is well established that assessing a search's reasonableness "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails," *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). In conducting this analysis, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.*

Applying these principles in the prison context, the Supreme Court in *Bell* held that a prison policy requiring all inmates and pretrial detainees to submit to visual body cavity searches following contact visits did not violate the Fourth Amendment. 441 U.S. at 558–60. While the Court recognized that such searches were invasive, it reasoned that they were nonetheless reasonable even absent individualized suspicion in light of the prison officials' "significant and legitimate security interests." *Id.* at 560. As the Court explained, "[a] detention facility is a unique place fraught with serious security dangers." *Id.* at 599.

12

In particular, it noted that the "[s]muggling of money, drugs, weapons, and other contraband is all too common an occurrence," with documented instances of "inmate attempts to secrete these items into the facility by concealing them in body cavities." *Id.* Given the importance of maintaining internal security — and the severe threat contraband poses to that security — the Court deferred to the judgment of prison administrators and upheld the policy as constitutionally reasonable. *Id.* at 558; *see also Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 330 (2012) (holding that a county jail could constitutionally require all inmates, including those arrested for minor offenses, to submit to visual strip searches as part of the process of being admitted to the jail's general population); *cf. Block v. Rutherford*, 468 U.S. 576, 586 (1984) (noting that contact visits "open the institution to the introduction of drugs, weapons, and other contraband" and remarking that "[v]isitors can easily conceal . . . contraband in countless ways and pass them to an inmate unnoticed by even the most vigilant observers").

Applying these principles to prison employees, we held in *Leverette v. Bell*, 247 F.3d 160 (4th Cir. 2001), that even though prison employees enjoy greater privacy interests than do prison inmates or pretrial detainees, the "unique" security concerns in the prison context generally justify officials' visual body cavity searches of prison employees based on reasonable and individualized suspicion. *Id*. at 167–68. In so holding, "we emphasiz[ed] that reasonable suspicion is the minimum requirement," and we instructed that "the more personal and invasive the search activities of the authorities become, the more particularized and individualized the articulated supporting information must be." *Id*. at 168. We noted that our conclusion was "bolstered by our sister circuits' decisions

13

applying the reasonable suspicion standard to searches of prison visitors," strongly suggesting that the same standard would apply to both prison employees and prison visitors. *Id*. at 168. Indeed, in an unpublished opinion, we had previously applied the reasonable suspicion standard to evaluate the legality of a prison visitor's strip search. *See United States v. Johnson*, 27 F.3d 564, 1994 WL 260806, at \*2 (4th Cir. June 15, 1994) (unpublished) (stating that "[a] reasonable suspicion standard applies to strip searches of prison visitors").

Accordingly, we now make clear that, as the parties agree, the standard under the Fourth Amendment for conducting a strip search of a prison visitor — an exceedingly personal invasion of privacy — is whether prison officials have a reasonable suspicion, based on particularized and individualized information, that such a search will uncover contraband on the visitor's person on that occasion. *See, e.g.*, *Spear v. Sowders*, 71 F.3d 626, 630 (6th Cir. 1995); *Blackburn v. Snow*, 771 F.2d 556, 564–65 (1st Cir. 1985); *Thorne v. Jones*, 765 F.2d 1270, 1276 (5th Cir. 1985); *Hunter v. Auger*, 672 F.2d 668, 674–75 (8th Cir. 1982). This reasonable suspicion standard has been a familiar part of the Fourth Amendment jurisprudence since *Terry v. Ohio*, 392 U.S. 1 (1968), and it requires "a particularized and objective basis for suspecting the particular person" as judged by the totality of facts and circumstances known to the relevant officers at the time, *Heien v. North Carolina*, 574 U.S. 54, 60 (2014); *Alabama v. White*, 496 U.S. 325, 330 (1990) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Requiring more than a mere "hunch" but less than probable cause, the "standard is not an exacting one" and demands "only 'a moderate chance of finding evidence of wrongdoing.'" *Braun v. Maynard*, 652 F.3d 557,

14

561 (4th Cir. 2011) (quoting *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 371 (2009)).

In this case, the record demonstrates beyond genuine dispute that Sgt. Lokey and Unit Manager Brown made the decision to seek Calloway's consent to a strip search based on a sequence of events that, viewed together, culminated in a reasonable suspicion that Calloway was attempting to pass contraband to Talbert during her July 17 visit. First, Lokey knew that, earlier in the year, Talbert had enlisted his mother to help in a conspiracy to smuggle tobacco into a different Virginia prison. Then, sometime after Talbert's transfer to Augusta, Lokey started to hear from informants that he should keep an eye on "Travis." And two days prior to Calloway's visit, Lokey received a more concrete tip from an inmate that "Talbert was moving," a term that Lokey knew to be prison slang for drug smuggling. All of this information suggested that Talbert might attempt to have an outside visitor sneak contraband into Augusta, as he had attempted to do at Bland. Thus, it was reasonable for Lokey to direct Officer Nelson to keep a particularly close watch on Talbert and any visitor he received that weekend. Then, in the context of this heightened scrutiny, Lokey received a report from Nelson during the course of Calloway's visit with Talbert that he (Nelson) had observed Calloway adjusting her waistband in a suspicious manner and, indeed, that it looked to him like she had just unbuttoned her pants while in the visitation room. This information was especially meaningful to Lokey in light of his knowledge that "Nelson [had] been very successful in the past [in] identifying suspicious actions [that] [had] led to the interception of drugs or other contraband."

15

We conclude that this sequence of events — taken as a whole — was legally sufficient to justify a reasonable officer's belief that there was at least "a moderate chance" that Calloway was concealing contraband on her person while visiting the prison. *Safford Unified Sch. Dist. No. 1*, 557 U.S. at 371. Accordingly, Sgt. Lokey and Unit Manager Brown, who together made the decision that Calloway be strip-searched, did so based on reasonable suspicion. The strip search of Calloway — though embarrassing and perhaps frightening — did not violate her Fourth Amendment rights.

To challenge this conclusion, Calloway argues that Sgt. Lokey and Unit Manager Brown acted unreasonably in accepting Officer Nelson's description of her conduct in the visitation room, rather than replaying the relevant portion of the surveillance video for themselves. But, as the district court correctly reasoned, Lokey and Brown were entitled to rely on Nelson's report of his observations. As the Supreme Court has made plain, "[t]he difficulties of operating a [prison] must not be underestimated by the courts," and "[m]aintaining safety and order at these institutions requires the expertise of correctional officials." *Florence*, 566 U.S. at 326. By necessity, the officers charged with maintaining safe and secure prisons must assume different roles and responsibilities and be able to rely on each other to perform their differentiated tasks. Here, the record reveals no reason why Sgt. Lokey and Unit Manager Brown should have doubted the accuracy of Officer Nelson's report, and we thus cannot accept Calloway's suggestion that it was constitutionally unreasonable for Lokey and Brown to have acted on it. *Cf. United States v. Ventresca*, 380 U.S. 102, 111 (1965) (recognizing that "[o]bservations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant").

16

With respect to Calloway's claim against Officer Nelson, Calloway argues that he acted unreasonably because he misidentified and made up the facts that he reported to Sgt. Lokey. In addressing this argument, it is important to note that Nelson was not the decisionmaker on whether to conduct the search; indeed, he did not even make a recommendation on the issue. His task was limited to monitoring a live video feed of Calloway and Talbert's interaction in the visitation room and alerting Sgt. Lokey if he observed something that he considered suspicious. And while monitoring the live video feed on July 17, Nelson did believe that he had observed something suspicious. Specifically, he testified that, after monitoring Talbert and Calloway's visit for about an hour, he saw Calloway reach inside the waistband of her pants in a way that looked like she had just undone the button. On seeing this, Nelson immediately "advised [Sgt. Lokey] that [he] thought that [Calloway] had unbuttoned the front of her pants" while in the visitation room. His role ended there.

While Calloway argues that Officer Nelson made up the facts of his report, we have reviewed the video of Talbert and Calloway's visit and agree with the district court that it supports Nelson's report to Sgt. Lokey. The recorded video is choppier than the live feed that Nelson was monitoring, but it nonetheless shows that, at about an hour into the visit, Calloway brought her hand to the waistband of her pants and adjusted her clothing in such a way that a reasonable officer watching the video feed in real time could readily have believed that Calloway had just unbuttoned her pants. As the district court correctly concluded, "there is nothing in the record that supports any assertion that Nelson made up

17

the conduct that he reported to Lokey" or that he otherwise acted unreasonably in reporting his observations to Lokey. *Calloway*, 2018 WL 4323951, at *4.

In her reply appellate brief, Calloway acknowledges that the video shows her making "several momentary clothing adjustments" but maintains that the "most reasonable interpretation of [these movements] is that Calloway might have been feeling self-conscious, or uncomfortable in her clothing during the nearly 90 minutes she visited Talbert." This argument, however, is beside the point because Nelson drew no conclusion about why Calloway adjusted her clothing and appeared to unbutton her pants. He only reported what he saw — that Calloway had brought her hand to her waistband and adjusted her clothing in such a way that it looked like she had just unbuttoned her pants. Moreover, the argument overlooks the well settled principle that circumstances "susceptible of innocent explanation," when taken together, can contribute to the "determination that reasonable suspicion exists." *United States v. Arvizu*, 534 U.S. 266, 277 (2002). When Nelson's information was reported to Sgt. Lokey, it, combined with all of the other information of which Lokey was aware, created a reasonable suspicion that Calloway was hiding contraband. As to Officer Nelson, then, the facts of record continue to show that he acted reasonably in his limited role and therefore that he was entitled to summary judgment.

Finally, Calloway's Fourth Amendment claim against Sgt. Brown and Officer Hale, who conducted the search, merits little discussion. To be sure, in conducting a strip search, officers must proceed "in a reasonable manner." *Bell*, 441 U.S. at 560. But by Calloway's own account, the two female officers who conducted the search did so in a private setting and proceeded in a professional manner after being told that Calloway had consented to

18

the search.[2] Indeed, Calloway's only challenge to the manner of the search appears to be her contention that the search should have been conducted in the prison's front entry area, rather than in the secure part of the facility near where the visitation room was located. She provides no support, however, for the proposition that the Fourth Amendment required the officers to escort her to an entirely different portion of the facility before conducting a search, and we find such a suggestion untenable. The search was conducted professionally and in an appropriate setting, and we find no basis in the record for imposing liability on Sgt. Brown and Officer Hale.

At bottom, we conclude that Sgt. Lokey and Unit Manager Brown possessed the requisite reasonable suspicion to justify the search because the totality of the circumstances of which they were aware pointed to at least a moderate chance that Calloway was concealing contraband on her person. And nothing in the record shows that Officer Nelson, Sgt. Brown, or Officer Hale acted improperly or unreasonably in their limited support roles. In these circumstances, the corrections officers were entitled to summary judgment on Calloway's Fourth Amendment claim.

---

[2] While the record, without dispute, shows that Calloway signed the consent to search form, in view of her assertion that "she did not feel she had the choice to refuse the search," the district court "d[id] not reach the issue of whether the undisputed facts establish voluntary and knowing consent." *Calloway*, 2018 WL 4323951, at *7 n.7. Because, like the district court, we find that the officers who authorized the search had a reasonable suspicion that justified it, we similarly do not reach this issue.

## III

Relying on its ruling that the corrections officers did not violate the Fourth Amendment in conducting a strip search of Calloway, the district court determined that Calloway could not prove the elements necessary to establish her state law claims for assault, false imprisonment, and intentional infliction of emotional distress. On this, we likewise agree, given the elements necessary to prove those claims. *See Carter v. Commonwealth*, 606 S.E.2d 839, 841 (Va. 2005) (recognizing that "a common law assault, whether a crime or tort, occurs when an assailant engages in an overt act intended to inflict bodily harm and has the present ability to inflict such harm *or* engages in an overt act intended to place the victim in fear or apprehension of bodily harm and creates such reasonable fear or apprehension in the victim); *Lewis v. Kei*, 708 S.E.2d 884, 890 (Va. 2011) (recognizing that "[f]alse imprisonment is the restraint of one's liberty without any sufficient legal excuse" and that "[i]f the plaintiff's arrest was lawful, [she] cannot prevail on a claim of false imprisonment"); *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991) (recognizing that a claim for intentional infliction of emotional distress requires the plaintiff to prove "by clear and convincing evidence" that, *inter alia*, the defendant's conduct was "intentional or reckless" and that it was "outrageous and intolerable").

\*   \*   \*

Accordingly, we affirm the judgment of the district court.

AFFIRMED

20

WYNN, Circuit Judge, dissenting:

In this Civil Rights action, the majority opinion breaches the congressional purpose and history of 42 U.S.C. § 1983 by first, framing the issue to address the rights of the governmental officers, rather than the rights of the individual; and second, failing to view the evidence in the light most favorable to non-moving party, as we are required to do when reviewing a grant of summary judgment.

Each year, millions of individuals—mothers, fathers, grandparents, spouses, children, relatives, and friends—visit the nearly 1.5 million prisoners in the United States. Angela Calloway was just one such visitor when she visited an inmate at a Virginia prison after she passed a background check and underwent a security screening.

But during her visit with the inmate, without any warning, two correctional officers took Ms. Calloway out of the visitation room, through secured doors, and into the prison records office. The officers accused Ms. Calloway of smuggling contraband, and they told her they had justification to "strip search" her. Two additional officers arrived and took Ms. Calloway into a bathroom, where one officer stood in front of the door and the other told Ms. Calloway to take off her clothing one article at a time. After Ms. Calloway completely undressed, the officers ordered her to twice squat and cough forcefully and to spread her buttocks for inspection of her anus. The officers also had Ms. Calloway remove her tampon from her vagina and give it to an officer. As it turned out, Ms. Calloway was completely innocent of the accusation—the officers found no contraband whatsoever.

21

Humiliated, embarrassed, and rightfully believing that the governmental officers had acted "under color of law" to unconstitutionally subject her to an intrusive bodily search, Ms. Calloway brought this action under 42 U.S.C. § 1983. That course of action by Ms. Calloway appropriately followed the Supreme Court's guidance that "[t]he very purpose of § 1983 was . . . to protect the people from unconstitutional action under color of state law." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972). Section 1983, in relevant part, states:

> Every person who, under color of any [law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured . . . .

Unquestionably, § 1983 focuses on the rights of individuals rather than the rights of those who act "under color of law." But the majority opinion improperly frames the issue in this case as "whether corrections officers had a reasonable suspicion sufficient under the Fourth Amendment to justify conducting a strip search of a prison visitor." *Ante* at 3. Yet, this case is not about "a strip search," it is about a search significantly more intrusive than a "standard strip search."[1] And more importantly, it is not a case about the officers' rights; it is about the rights of the individual, Ms. Calloway, to not be subjected to an intrusive bodily search.

Upon viewing the evidence in this case—to determine whether Ms. Calloway's rights were violated—under the appropriate legal standard, which is in a light most

---

[1] As stated later, *see infra* p. 16, this was an intrusive search that involved an invasive search of Ms. Calloway's vaginal and anal cavities.

favorable to her, it is evident that a reasonable jury could conclude the intrusive search was not supported by reasonable suspicion based on individualized, particularized facts. With respect for my colleagues in the majority, I must dissent.

I.

This case is before us on appeal from the grant of the officers' motion for summary judgment. Accordingly, we must "construe the evidence" and "view the facts and any reasonable inferences in the light most favorable" to Ms. Calloway, the non-moving party. *Betton v. Belue*, 942 F.3d 184, 190, 191 (4th Cir. 2019). We must "not weigh the evidence or make credibility determinations." *Id.* at 190. And for Ms. Calloway's claims "[t]o survive summary judgment, 'there must be evidence on which the jury could reasonably find for the [nonmovant].'" *Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017) (second alteration in original)).

Although the majority opinion recounts that we "apply[ ] the same standard that the district court was required to apply," it does not explicitly acknowledge that we must view the evidence in the light most favorable to Ms. Calloway. *Ante* at 12. On several factual questions, the majority fails to apply that required standard. That failure constitutes a "violation of basic summary judgment principles." *Harris v. Pittman*, 927 F.3d 266, 273 (4th Cir. 2019), *petition for cert. filed*, No. 19-466 (U.S. Oct. 9, 2019).

A.

First, the majority opinion aggregates the knowledge of all officers involved in the search of Ms. Calloway—no matter how tangentially—without regard to what information

23

was actually known at the time by the decision-making officers, Lokey and Jeffrey Brown. This is error.

This Circuit does not permit the "knowledge of several officers [to] be aggregated to create probable cause" or reasonable suspicion. *United States v. Massenburg*, 654 F.3d 480, 493–94 (4th Cir. 2011) (quotations and citations omitted). True, under limited circumstances, the action of one officer taken on another's instruction "is justified if the instructing officer had sufficient information to justify taking such action herself." *Id.* at 492. But this "does not permit us to aggregate bits and pieces of information from among myriad officers, nor does it apply outside the context of communicated alerts or instructions." *Id.* at 493. Rather, "we focus on the facts and circumstances confronting the officer 'immediately prior to and at the very moment'" the challenged action occurred "and disregard information not known to the officer at that time." *Ray v. Roane*, No. 18-2120, slip op. at 2 (4th Cir. Jan. __, 2020) (quoting *Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991)).

The majority acknowledges that it is "beyond genuine dispute that [Lokey and Jeffrey Brown] made the decision" to search Ms. Calloway. *Ante* at 15. Nevertheless, the majority opinion relies upon information unknown to those officers at the time of the decision.

For example, in his deposition, Lokey stated that no one told him, prior to the search, that Ms. Calloway had been acting nervously. [J.A. 429.] Nonetheless, the majority opinion recounts that Heidi Brown "later recalled that [Ms.] Calloway 'looked a little frazzled and kind of nervous,'" and finds that Nelson "thought that '[Ms.] Calloway appeared to be

24

nervous.'" *Ante* at 5–6. Similarly, although the majority opinion reports that "Nelson also thought that 'Talbert [the inmate,] seemed to be keeping an eye on the correctional officers as they made their rounds' through the visitation room," nothing in the record suggests that Nelson's observation was communicated to Lokey or Jeffrey Brown. *Ante* at 6.

Significantly, Nelson and Heidi Brown's uncommunicated observations are irrelevant to the analysis of whether Lokey and Jeffrey Brown had reasonable suspicion to justify the intrusive body search. By including these irrelevant details, the majority opinion fails to "disregard information not known to" Lokey and Jeffrey Brown at the time they decided to conduct an intrusive search of Ms. Calloway's body. *Ray*, No. 18-2120, slip op. at 2. That improperly and incorrectly suggests that the decision to conduct an intrusive search of Ms. Calloway's body was based on more information than the record supports.

B.

Second, in discussing the "tip" heard by Lokey, the majority opinion fails to view the facts in the light most favorable to Ms. Calloway. The majority overstates the informational value of the "tip" when it describes it as "a more concrete tip from an inmate that 'Talbert was moving.'" *Ante* at 15. In his deposition, Lokey acknowledged he could not "recall who said that" Talbert was moving, but that he heard it "through passing." J.A. 378. Viewing the evidence in the light most favorable to Ms. Calloway, Lokey heard "through passing" from someone—not necessarily an inmate—that an individual named Talbert, an inmate, was "moving."

25

Importantly, this "tip" stands in stark contrast with those found to support searches in comparable cases. In other cases, the tip came from a known and reliable source, specified the individual of concern, *and* provided details about that individual's plan.

For example, in *Leverette v. Bell*, an informant stated that a specific prison employee planned to smuggle marijuana into the prison by concealing it in a tampon. 247 F.3d 160, 163 (4th Cir. 2001). That informant had previously provided accurate tips. *Id.* And in *Varrone v. Bilotti*, which the defendants cited before the district court, the Second Circuit considered a prosecutor's tip that an inmate's wife and son would soon visit and that they would try to bring heroin into the prison when they did. 123 F.3d 75, 77 (2d Cir. 1997). The court concluded the tip sufficiently established reasonable suspicion to search the wife and son when they visited the prison later that month. *Id.* at 80 ("The information identified the smugglers by name, stated where and when they would commit the offense and specified the particular drug they would attempt to smuggle.").

The tips provided to the officers in *Varrone* and *Leverette* were specific to the persons searched, came from reliable sources, and included details as to the drug or method of smuggling. *Id.* at 77; *Leverette*, 247 F.3d at 163. The "tip" in this case bore none of these markers. Lokey was unable to identify who provided the "tip," which had no indicia of reliability. Nor did the "tip" identify a particular time, method, or material that would be "moved." And most critically, the "tip" did not identify or even implicate Ms. Calloway.

Additionally, the majority opinion does not view the record in the light most favorable to Ms. Calloway when it states that the "tip" Lokey heard "suggested that Talbert might attempt to have an outside visitor sneak contraband into Augusta, as he had

26

attempted to do at Bland." *Ante* at 15. In fact, at Bland, which is another correctional facility, Talbert had his mother and another inmate's sister leave several pounds of tobacco somewhere near the prison for another inmate to retrieve. So, even if Lokey believed Talbert was likely to attempt to smuggle in contraband, his past methodology did not involve an authorized visitor (like Ms. Calloway) smuggling contraband on her person into the visitation room.

C.

Third, the majority fails to view the record in the light most favorable to Ms. Calloway in describing Nelson's record of identifying suspicious activity in the visitation room.

The district court found that "Nelson had a history of successfully identifying suspicious behavior that led to the interception of contraband." J.A. 450. The majority echoes this naked characterization, concluding Nelson's report "was especially meaningful to Lokey in light of [Lokey's] knowledge that 'Nelson [had] been very successful in the past [in] identifying suspicious actions [that] [had] led to the interception of drugs or other contraband.'" *Ante* at 15 (second through fifth alterations in original). By referring to Lokey's "knowledge" about Nelson's past success, the majority accepts that Lokey's characterization is accurate. In fact, when asked in his deposition about his history of identifying suspicious behavior, Nelson stated he had twice observed visitors actually accessing contraband in their clothing during visitation. [J.A 284]. The record does not indicate the total number of times Nelson had identified visitors as behaving suspiciously or whether he had previously identified suspicious behaviors where the visitors did not, in

27

fact, have contraband. Thus, there is no way to evaluate whether he had only sounded the alarm twice and been correct both times, had gotten lucky twice and been incorrect numerous other times, or something in between.

In short, this evidence does not support the conclusion that "Nelson [had] been very successful in the past [in] identifying suspicious actions." In fact, that characterization of the record improperly accepts Lokey's perception as accurate and draws an inference *against* Ms. Calloway.

D.

Additionally, the majority opinion did not view the facts in Ms. Calloway's favor when it failed to properly identify the moment Lokey and Jeffrey Brown concluded they were justified in searching Ms. Calloway.

Evidence in the record shows that Lokey and Jeffrey Brown had already decided they had reasonable suspicion to conduct an intrusive search of Ms. Calloway's body before they removed her from the visitation room. Specifically, when he was asked to describe his involvement in the decision to "request [Ms. Calloway's] consent to a 'strip search,'" Jeffrey Brown responded that "Lokey informed [him] that he had reasonable suspicion based on a report from another staff member." J.A. 314–15. And the report documenting the search completed by Heidi Brown indicates a time of 1:50 p.m., more than five minutes prior to the time the video in the record shows officers entering the visitation room to remove Ms. Calloway. [J.A. 412.] Ms. Calloway's signature on the Consent for Strip or Body Cavity Search form indicates a time of 2:04 p.m. [J.A. 318.] In her deposition, Heidi Brown indicated she thought she may have been summoned to

28

perform the search before Ms. Calloway signed the consent form. [J.A. 351.] That follows from the fact that her report bears a time stamp before the search and before the consent form was signed.

Viewing this evidence in the light most favorable to Ms. Calloway, as we are required to do at this stage, Lokey and Jeffrey Brown concluded, following Nelson's report, that they had reasonable suspicion Ms. Calloway was trying to smuggle contraband, and they summoned a female officer, Heidi Brown, to strip search her. The majority, however, describes their decision as "agree[ing] to speak to Calloway to request that she consent." *Ante* at 7. That unfairly delays the moment at which we measure for reasonable suspicion. And by delaying that moment, the majority opinion again opens the door for information— in this instance, Ms. Calloway's answers to Lokey and Jeffrey Brown's questions after they removed her from the visitation room—unknown to the decision-making officers when they made the decision to search.

In short, the majority opinion, through subjective word choice and selective inclusion of information, paints the record not in the light most favorable to Ms. Calloway, the non-moving party, but rather to the officers. That runs counter to the most fundamental principles of summary judgment analysis because deciding whose account of events is more believable is not our task. Nor is our task to scour the record for details that legitimize, after the fact, the officers' decisions. Instead, our task on review of summary judgment is only to decide whether, viewing the record in the light most favorable to Ms. Calloway and drawing reasonable inferences in her favor, a reasonable jury could conclude Lokey and Jeffrey Brown lacked individualized, particularized information about Ms. Calloway to

29

support a reasonable suspicion. As further discussed below, I believe a reasonable jury could.

## II.

As described above, the majority opinion failed to view the record in the light most favorable to Ms. Calloway. Contrary to the majority opinion's conclusion, when we properly disregard the information unknown to the decision-making officers, Lokey and Jeffrey Brown, at the time of the search, it is apparent that they had little individualized, particularized information when they concluded they had reasonable suspicion and summoned officers to conduct the intrusive body search. They had Nelson's report about Ms. Calloway adjusting her pants in the visitation room, they knew Ms. Calloway was visiting the inmate, Talbert, and they knew that Lokey had heard vague information from an unidentified source that "Talbert was moving." [2]

The majority concludes "that this sequence of events—taken as a whole—was legally sufficient to justify a reasonable officer's belief that there was at least 'a moderate

---

[2] Unlike Lokey and Jeffrey Brown, Ms. Calloway knew none of this information. Ms. Calloway "[did not] really know about the situation" involving Talbert smuggling tobacco at a different prison. J.A. 302. Nothing in the record suggests Ms. Calloway knew that Lokey heard from someone alleging that Talbert was "moving." And as it appears in the video in the record, Ms. Calloway's adjustment of her clothing—described by Nelson as "reach[ing] inside the front of her pants"—was innocuous and commonplace. J.A. 151. Even compared to other conduct in the visitation room, it would be difficult to know that Ms. Calloway's actions would rouse officers' suspicion. For example, the video of the visitation room shows another visitor repeatedly placing his or her hands under the visitor's shirt. Although Nelson described that conduct as "inappropriate" in his deposition, the video does not show that officers escorted that visitor out of the room or that officers suspected that visitor of smuggling contraband. J.A. 274–76.

chance' that [Ms.] Calloway was concealing contraband on her person while visiting the prison." *Ante* at 16. But whether a reasonable officer could believe Ms. Calloway was concealing contraband is not the question before us. The question is whether—viewing the evidence in the light most favorable to Ms. Calloway—a reasonable jury could conclude the search was *not* supported by the individualized, particularized information required by the Fourth Amendment.

In determining whether a reasonable jury could conclude the officers violated Ms. Calloway's rights, we consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). And although "reasonable suspicion is the minimum requirement, . . . the more personal and invasive the search activities of the authorities become, the more particularized and individualized the articulated supporting information must be." *Leverette*, 247 F.3d at 168.

As to the manner of the search, this was an intrusive search. Although the majority describes it as a "strip search," the officers in this case had Ms. Calloway expose her anal area and take out her tampon from her vagina and place it in an officer's hand for inspection. This was in addition to raising her arms, lifting her breasts, opening her mouth, and passing her hands through her hair. "Courts examining the constitutionality of physically intrusive searches have distinguished between strip searches, visual body cavity searches, and manual body cavity searches. A 'visual body cavity search' requires the searched individual to expose her anal and vaginal cavities for visual inspection." *Leverette*, 247 F.3d at 165 n.3. Unquestionably, the search of Ms. Calloway's body—which

31

included a visual inspection of her anal cavity and an order to remove her tampon from her vagina in front of two officers and place her used tampon in an officer's hand for inspection—was an intrusive search, more like a visual body cavity search than a standard strip search. *Id.* at 165 (describing a "standard strip search" as "requiring the subject to disrobe, squat, and cough").

Additionally, viewing the evidence in a light most favorable to Ms. Calloway shows that the officers' lacked justification for initiating the search. As even the district court acknowledged, "[m]ost of the video reflects largely innocuous behavior." J.A. 453. Nelson, who was watching a live video that differs slightly from the video in the record, saw and reported to Lokey that "it looked like [Ms. Calloway] reached inside the front of her pants." J.A. 151. That is the extent of the individualized, particularized information related to Ms. Calloway. At the time Lokey and Jeffrey Brown concluded they had reasonable suspicion to subject Ms. Calloway to a strip search and summoned female officers to conduct it, Lokey and Jeffrey Brown had the report from Nelson that Ms. Calloway had adjusted or "messed with" her pants, and Lokey had heard that Talbert was "moving." That's it. All of the other supporting information the officers identify was either unknown to Lokey and Jeffrey Brown at the time or related to the inmate, Talbert, not Ms. Calloway.

To be sure, prisons have unique and serious security needs. *See Bell*, 441 U.S. at 558–60. But those needs are met by allowing prison officials to strip search prison visitors when those officials have reasonable suspicion based on individualized, particularized information. But as we acknowledged for prison employees in *Leverette*, a visitor to a prison "does not forfeit all privacy rights" when she enters. 247 F.3d at 167. "[T]he ultimate

32

touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 573 U.S. 373, 381 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).

Looking to the considerations set out in *Bell* and *Leverette*, a reasonable jury could conclude the supporting information here—the report from Nelson and the vague information about the inmate who Ms. Calloway was visiting—was insufficient to justify this intrusive search. Accordingly, the officers in this matter were not entitled to summary judgment on the basis that no reasonable jury could find the search was not supported by reasonable suspicion. [3]

---

[3] The majority wisely does not address the qualified immunity analysis beyond concluding the search was supported by reasonable suspicion. As discussed, I disagree with the majority's conclusion that the information available to the decision-making officers amounted to reasonable suspicion. But even if the majority were to reach qualified immunity, I believe the right of prison visitors to be free from strip searches absent reasonable suspicion was clearly established at the time of this search. In determining "whether a right was clearly established, we first look to cases from the Supreme Court, this Court, or the highest court of the state in which the action arose." *Ray*, No. 18-2120, slip op. at 10. Looking to "our sister circuits' decisions applying the reasonable suspicion standard to searches of prison visitors," this Court has previously held "prison authorities generally may conduct a visual body cavity search when they possess a reasonable and individualized suspicion that an employee is hiding contraband on his or her person." *Leverette*, 247 F.3d at 168; *see also United States v. Johnson*, No. 93-5792, 1994 WL 260806, at *2 (4th Cir. June 15, 1994) (per curiam) ("A reasonable suspicion standard applies to strip searches of prison visitors.").

But even if *Leverette* and *Johnson* were somehow insufficient to put officials on notice that they may not strip search prison visitors without reasonable suspicion, cases from our sister circuits would surely suffice. "In the absence of 'directly on-point, binding authority,' courts may also consider whether 'the right was clearly established based on general constitutional principles or a consensus of persuasive authority.'" *Ray*, No. 18-2120, slip op. at 10 (quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017)). The Second Circuit concluded it was clearly established in March 1989, "under the law of the United States Supreme Court, the Court of Appeals for the Second Circuit, and the other circuit courts of appeals," that a search of prison visitors without reasonable suspicion violated the Fourth Amendment. *Varrone*, 123 F.3d at 78 (internal quotation (Continued)

III.

In addition to failing to apply key summary judgment principles, the majority opinion turns away from the promise of 42 U.S.C. § 1983's remedial purpose and profound historical impact.

Congress saw the need to enact 42 U.S.C. § 1983 following the Civil War to address lawlessness and violence by governmental actors against newly freed African Americans. *See generally* Eric Foner, *A Short History of Reconstruction* 180–98 (2014); *see also Ngiraingas v. Sanchez*, 495 U.S. 182, 187 (1990). By 1870, the Ku Klux Klan and other organizations, including those with law enforcement authority, perpetrated violence and terror against African Americans and proponents of Reconstruction. Foner, *supra*, at 184–88. And even governmental actors without a connection to the violence "either minimized the Klan's activities or offered thinly disguised rationalizations for them." *Id.* at 187

Eventually, Congress responded by enacting a series of Enforcement Acts in 1870 and 1871, "to counteract terrorist violence." *Id.* at 195. The Civil Rights Act of 1871 included a measure to criminalize, under federal law, acts and conspiracies to deny citizens their rights, allowing the federal government to prosecute where states failed to act. *Id.* The

---

marks omitted). Many of our sister circuits have held similarly. *Blackburn v. Snow*, 771 F.2d 556, 569–70 (1st Cir. 1985); *Thorne v. Jones*, 765 F.2d 1270, 1277 (5th Cir. 1985); *Daugherty v. Campbell*, 33 F.3d 554, 556 (6th Cir. 1994); *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir. 1982); *Romo v. Champion*, 46 F.3d 1013, 1019 (10th Cir. 1995); *see also Burgess v. Lowery*, 201 F.3d 942, 945 (7th Cir. 2000) ("In a long and unbroken series of decisions by our sister circuits stretching back to the early 1980s, it had become well established long before these defendants subjected these plaintiffs to strip searches that strip searches of prison visitors were unconstitutional in the absence of reasonable suspicion that the visitor was carrying contraband.").

current version of § 1983 derives from § 1 of that Act. *Ngiraingas*, 495 U.S. at 187. The Act was remedial, and it was part of a profound change in the relationship between federal and state authorities, particularly in the protection of individual rights against abuses by States and state officials. *Id.*

The historical context of 42 U.S.C. § 1983 illustrates its purpose and significance. But here, by focusing on the governmental officers in this case—framing the issue as being about the officers instead of constitutional rights, improperly weighing the officers' accounts over the plaintiff's testimony, and including supporting information unknown to the officers at the time of the alleged violation—the majority opinion betrays the promise of this historically significant statute. "The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law." *Mitchum*, 407 U.S. at 242.

IV.

Finally, these are not abstract concerns. Our adherence to the appropriate standards in enforcing constitutional rights has real consequences for real people, and not only Ms. Calloway.[4] Nearly 1.5 million individuals in this country are held in state or federal prisons.

---

[4] Recently, an eight-year-old girl was made to "strip first, then bend over and cough" in a Virginia prison—without the permission of her parents or guardian—when she was trying to visit her father for Thanksgiving. Katie Shepherd, *Virginia prison guards strip-searched an 8-year-old girl visiting her father*, Washington Post (Dec. 6, 2019), https://www.washingtonpost.com/nation/2019/12/06/virginia-prison-guards-strip-searched-year-old-girl-visiting-father/ (last visited Jan. 6, 2020).

Bureau of Justice Statistics, *Prisoners in 2017 Summary* 1 (2019), https://www.bjs.gov/content/pub/pdf/p17_sum.pdf. Those inmates have families and friends who visit them during their incarceration. The Virginia Department of Corrections itself acknowledges that "[v]isitors play an important role in an offender's successful re-entry into the community." Virginia Department of Corrections, Visiting an Offender, https://vadoc.virginia.gov/families-friends-of-offenders/visiting-an-offender/ (last visited Jan. 6, 2020). Indeed, the department touts programs available to inmates that rely on visitors to its institutions. *See, e.g.*, Virginia Department of Corrections, 105 Graduate at Haynesville Correctional Center, 17 Receive Associate's Degrees, Agency News (Nov. 18, 2019), https://vadoc.virginia.gov/news-press-releases/2019/105-graduate-at-haynesville-correctional-center-17-receive-associates-degrees/ (last visited Jan. 6, 2020).

Across the country, visitors to prisons help maintain family and community ties, enrich educational and vocational programs, and provide opportunities for religious study and observance. *See, e.g.*, Grant Duwe & Byron R. Johnson, *The Effects of Prison Visits from Community Volunteers on Offender Recidivism*, 96 Prison J. 279, 296–300 (2016). These efforts support rehabilitation and re-entry. *Id.* But subjecting visitors to an invasive body search on the basis of the scant information that the officers had here puts those programs and benefits at risk. Visitors will be deterred from entering a prison if they know

something as innocuous as adjusting their clothing could subject them to humiliating, degrading, and intrusive searches of their bodies.[5]

As this record shows, Ms. Calloway has not returned to Augusta since the day she was forced to stand naked, expose her body, and submit to a search of her vaginal and anal cavities by two correctional officers. And today, the majority opinion's failure to view the evidence in the light most favorable to her, as the law requires, quashes any hope that a reasonable jury will be allowed to determine whether the intrusive search of Ms. Calloway's body was based on the individualized, particularized, and reasonable suspicion required for such an invasive search.

V.

In sum, properly framing the issue in this matter, applying the appropriate standard of review to the facts, and focusing on the individual's rights at stake leads to the conclusion that a reasonable jury could determine that such limited information does not amount to the individualized, particularized, and reasonable suspicion required for such an invasive search.

---

[5] It is worth reiterating that Ms. Calloway had no reason to believe her clothing adjustment would create suspicion she was smuggling contraband. Indeed, she may not even have been conscious of her actions, which look on the video like common, thoughtless fidgeting. I suspect many other visitors would be in the same position—uninformed of vague information about smuggling heard by an officer, unfamiliar with the details of an inmate's disciplinary record, and unaware of the potential consequences of a mindless tick. Part of what makes this case appalling is that a visitor like Ms. Calloway could be oblivious to the very facts that officers use to justify an intrusive search.

37

So, what is now required for a law-abiding citizen to be subjected to an intrusive search of her body while visiting an inmate? The majority opinion answers:

1. A statement from an unidentified and uncorroborated source that the inmate will "move" contraband.

2. A report that the visitor at some point during an hour and half visit adjusted or touched her clothing.

3. The experience of an officer who has two prior successes—and an unknown number of false alarms—in detecting contraband on a visitor.

Because I disagree that this evidence was sufficient to show the individualized, particularized, and reasonable suspicion required for the invasive search of Ms. Calloway's body, I must, with great respect for my colleagues in the majority, dissent.